**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| TEXAS PRECIOUS METALS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 1:26-CV-00513-DAE |
| | § | |
| KELLY HANCOCK in his OFFICIAL | § | |
| CAPACITY as ACTING TEXAS | § | |
| COMPTROLLER of PUBLIC | § | |
| ACCOUNTS, and MACY DOUGLAS in | § | |
| her OFFICIAL CAPACITY as | § | |
| ADMINISTRATOR of THE TEXAS | § | |
| BULLION DEPOSITORY, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF TEXAS PRECIOUS METALS, LLC'S**
**AMENDED MOTION FOR PRELIMINARY INJUNCTION**

This case concerns a state agency that has moved beyond its statutory role as a custodian of precious metals and entered the marketplace as a seller of state-branded coins and gold notes. In doing so, Defendants have launched a commercial program that Chapter 2116 does not authorize, marketed those products as "official," and used Texas Precious Metals' registered Mint Mark in a manner that confuses consumers about source and affiliation.

The Court asked Texas Precious Metals ("TPM") to submit an amended motion for preliminary injunction and provide additional analysis on materiality, consumer impact, and irreparable harm. *See* Dkt. No. 21; Dkt. No. 25 at 10. The expanded record now answers those questions. It shows that Defendants' representations are not only misleading, but that they influence purchasing decisions in the real world. Consumers have bought Defendants' products under the mistaken belief that they are "official" and legal tender, declined purchases of TPM's products when they believed TPM was not affiliated with the State, and expressed confusion across multiple public platforms. That evidence reflects real-world confusion shaped by Defendants' messaging.

The same record shows ongoing harm that cannot be fully remedied after the fact. Defendants continue to sell products bearing TPM's mark while promoting them as part of an official state initiative. Each sale reinforces mistaken associations, diverts customers, and diminishes TPM's control over its reputation. Those effects are difficult to measure and cannot be unwound through damages alone.

Defendants insist that the statute permits this program and that any confusion is cured by disclaimers. But Chapter 2116 does not grant open-ended authority to create new **commercial** products. Nor do Defendants' disclaimers alter the overall impression created by their marketing,

1

which presents the products as official, state-issued coins. The evidence shows that consumers receive that message, and it confuses them.

Finally, this Court remains the proper forum to resolve these issues. TPM filed this action first and has moved to address the related case accordingly. The questions before the Court—statutory authority, false advertising, and trademark infringement—substantially overlap and should be decided here.

Because the record demonstrates a likelihood of success on the merits, ongoing and irreparable harm, and a strong public interest in preventing unauthorized state action and consumer confusion, the Court should grant the requested preliminary injunction.

**FACTUAL BACKGROUND[1]**

A central feature of TPM's branding is a series of source-identifying marks featuring a silhouette of the State of Texas (the "Mint Mark"), which TPM uses consistently across its precious metals products, including its Texas-themed gold and silver "rounds"[2] (the "Texas Rounds") and its Dallas-Fort Worth Texas Gold Note. Ex. A, Declaration of Tarek Saab ("Saab Decl.") at ¶ 12, 14, 16, 17. TPM owns an incontestable federal trademark registration for the Mint Mark. *Id*. at ¶ 21.

In December 2025, Defendants announced "a new program" offering: (1) "commemorative coins . . . featuring 1oz gold coins in proof and uncirculated (bullion) finishes and 1oz silver coins

---

[1] TPM incorporates by reference the facts alleged in its First and Second Amened Complaints and in its Motion for Temporary Restraining Order and Preliminary Injunction. *See* Dkt. Nos. 18, 19, 27.

[2] In the precious metals industry, the terms "round" and "coin" have different meanings. "Coin" denotes official coinage by sovereign-governments with face value and legal tender status. By contrast, a "round" is minted by a private manufacturer and has no legal tender status. Ex. A, Saab Decl. at ¶ 15.

in uncirculated (bullion) finishes" ("State of Texas Coins"),[3] and (2) "commemorative gold notes" ("Redbacks").[4]

Defendants manufacture the Agency Products out of state,[5] promote them through the Agency's website and affiliated marketing,[6] and sell their products by linking to a third party, with plans to sell the products directly from the Agency's website "soon." *See* Ex. A, Saab Decl. at ¶¶ 29–30, 33–44.[7] Defendants and their affiliates market the Agency Products as "official" and backed by the State.[8] Defendants do so using TPM's Texas-silhouette Mint Mark on their products and marketing:[9]

| TPM's Texas Rounds | Agency's State of Texas Coins |
|:---:|:---:|
|  |  |

---

[3] *See* https://texasbulliondepository.gov/state-of-texas-coins, last accessed March 27, 2026.

[4] *See* https://texasbulliondepository.gov/modern-texas-redbacks-the-gold-notes-of-texas, last accessed March 27, 2026.

[5] *See* Exs. A-8, A-10.

[6] *See, e.g.,* https://texasbulliondepository.gov/modern-texas-redbacks-the-gold-notes-of-texas, last accessed March 27, 2026; *see also* Ex. A, Saab Decl. at ¶ 34.

[7] *See* https://texasbulliondepository.gov/where-to-buy, last accessed March 27, 2026.

[8] *See* Kitco NEWS, *Physical Metals Enter the State Economy: Texas Unveils Official Bullion Program* (Feb. 11, 2026), available at: https://www.youtube.com/watch?v=LrCsUQcJou8 (*"Texas is the first state to facilitate a closed loop system for precious metals from manufacturing to vaulting to direct to consumer sales. By launching its own branded coins and gold bills through an official dot gov storefront, the state is creating a physical alternative to traditional financial systems."*), last accessed March 27, 2026; *see also* Ex. A, Saab Decl. at ¶¶ 57–58.

[9] *See* https://texasbulliondepository.gov/state-of-texas-2025-1-oz-silver-coin, last accessed March 27, 2026.

| **TPM's Texas Rounds** | **Agency's State of Texas Coins** |
|---|---|
|  |  |

*See* Ex. A, Saab Decl. at ¶¶ 14, 29.

But the authorizing statute does not allow Defendants' new program. Chapter 2116 of the Texas Government Code established the Agency as "***to serve as the custodian, guardian, and administrator of certain bullion and specie***." Tex. Gov't Code § 2116.002(a)–(b) (emphasis added). In 2019, the Texas House considered expanding the Agency's operations to add a new Section 2116.0215 to permit it to "offer for sale under Section 2116.021(c) commemorative gold and silver coins," including how such coins would have been designed and sold. *See* Tex. H.B. 2458, 86th Leg., R.S. (House floor amend. adopted Apr. 24, 2019). But that proposal was struck from the bill. *See* Tex. H.B. 2458, 86th Leg., R.S. (House floor amend. adopted Apr. 25, 2019). Instead, the Agency has limited authority to: "advertise and promote the depository in any available media" and "sell promotional items approved by the administrator to further the purposes of this chapter and to promote the depository." Tex. Gov't Code § 2116.021.

The Agency Products, including their use of TPM's mark, cause marketplace confusion regarding source, sponsorship, affiliation, and/or approval. As just one example, on February 12, 2026, a potential customer called TPM to order "30 of the Texas silver coins." Ex. A, Saab Decl. at ¶ 73; Ex. A-20. When a TPM representative asked, "Are you referring to Texas Mint or to the Texas Bullion Depository?" *Id*. The caller replied, "Well, which is the one that's actually dealing with the comptroller?" *Id*. When told that TPM does not deal with the Comptroller, the caller said,

"Oh, really? Yeah. Okay. Well, **I wanted to get the official stuff**." *Id*. The caller did not buy anything from TPM before hanging up. *Id*.

Similar instances of confusion pervade social media. Ex. A, Saab Decl. at ¶ 64; Ex. A-21 (collecting internet posts demonstrating consumer confusion). For example, in reference to Defendants' announcement of the State of Texas Coins, an X user posted "**Texas just announced they will be producing their own money** in gold and silver coins." *Id*. (emphasis added). Citing the same announcement, a user erroneously posted online that the State of Texas has been selling the State of Texas Coins since 2017 and included a link to **TPM's website**. *Id*.

## ARGUMENT AND AUTHORITIES

A preliminary injunction is the only remedy that will stop the ongoing, irreparable harm caused by Defendants' unlawful, *ultra vires* actions and Lanham Act violations.[10] A preliminary injunction is available where: "(1) there is a substantial likelihood that the plaintiff will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs whatever damage the proposed injunctive relief would cause the defendant; and (4) the granting of the injunction is not adverse to the public interest." *Grae v. Alamo City Motorplex, LLC*, No. 5:18-CV-664-DAE, 2018 WL 4169309, at *4 (W.D. Tex. July 2, 2018).

### I.    TPM Will Succeed On All Its Claims

#### A.  TPM Will Succeed On Its *Ultra Vires* Claim

Injunctive relief is an appropriate remedy to prevent a government agency from exceeding its statutory authority. *See Texas v. Becerra*, 89 F.4th 529, 533 (5th Cir.), *cert. denied*, 145 S. Ct.

---

[10] Texas Precious Metals seeks leave to file a Second Amended Complaint, which includes additional trademark claims under the Lanham Act. *See* Dkt. No. 27.

139, 220 L. Ed. 2d 12 (2024). A claim challenging *ultra vires* conduct may be brought against state officials in their official capacities. *See, e.g.*, *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 321 (5th Cir. 2008); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

Whether an agency has exceeded its authority begins with the statute itself. Courts must look "first and foremost" to the statute's "plain language" and enforce it "as written." *Bexar Appraisal Dist. v. Johnson*, 691 S.W.3d 844, 847 (Tex. 2024); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Courts do not interpret a statute's "vague terms or ancillary provisions" as fundamentally altering a statute's purpose because a legislature "does not . . . hide elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). That is because a Texas agency "has only those powers expressly conferred upon it by the Legislature." *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001). "An agency may not . . . exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." *Id.*

### a. The Legislature Rejected Authority for the Agency to Sell Commemorative Coins

In 2019, the Texas House rejected a statutory amendment to authorize the Agency to "offer for sale . . . gold and silver coins." Tex. H.B. 2458, 86th Leg., R.S. (House floor amend. Adopted Apr. 25, 2019). As enacted and amended, Chapter 2116 grants no authority to mint, sell, or market commemorative coins or gold notes. Where the Legislature did grant authority—even to take minor administrative actions—it did so explicitly, not by implication. *See, e.g.*, Tex. Gov't Code §§ 2116.005 (prescribing standards for depository accounts), 2116.006 (listing instructions for delivery of precious metals), 2116.008 (requiring contracts for depository accounts). The Legislature even saw fit to grant the Agency explicit statutory authority to lease "one or more buildings to operate the depository." *Id*. at § 2116.071. Chapter 2116 grants the Agency specific,

6

enumerated powers—including authority to receive deposits and lease facilities—while omitting any authority to mint or sell precious metals. *See* Tex. Gov't Code §§ 2116.005, 2116.071. If Defendants had broad authority to exceed the bounds of the Legislature's expressly granted authority, those detailed grants would be unnecessary. They are not.

### b. *"Promotional Items" Is Not Sufficient Implied Statutory Authorization*

Defendants rely on an implausibly expansive reading of Section 2116.021(c)'s authority to sell "promotional items." But a state agency is limited to only those powers necessary to carry out explicit functions, and it cannot expand its own authority to conduct new functions that are otherwise not authorized. *City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d at 316. Defendants cannot rewrite the statute to add terms that the Legislature explicitly rejected. *See id*.

It is the Court's job to interpret "promotional item," using its "ordinary meaning" at the time the Texas Legislature enacted the statute. *See Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 284 (2018). When the Legislature permitted the Agency "to sell promotional items," the "broader statutory context" shows the Legislature did so having consistently used the plain meaning of traditional advertising merchandise. *See id.*, 585 U.S. at 278–79; *cf.* Tex. Transp. Code § 204.009(a) (permitting transportation agency "to sell promotional items" "such as calendars, books, prints, caps, light clothing, or other items approved by the commission that advertise the resources of this state") (emphasis added). These and the many other illustrative examples show the Legislature's actual plain meaning of the term.[11] While the sale of just about anything with the

---

[11] Under the heading *Sale of Promotional Items*, the Texas Government Code authorizes the Governor's Office of Economic Development to "sell or contract for the sale of items, **including clothing, posters, and banners**, to promote Texas manufactured products." Tex. Gov't Code § 490C.056 (emphasis added). Under the heading *Sale of Promotional Items or Program Merchandise*, the Texas Agriculture Code authorizes the Texas Department of Agriculture to "sell or contract for the sale of 'Go Texan' promotional items and program merchandise, **including clothing, posters, and banners**, in order to encourage the marketing and promotion of agricultural and other products

agency's name on it could be "promotional," that cannot mean that the Legislature intended the more expansive interpretation of "promotional item" than the ordinary meaning it had ascribed in similar statutes at the time. *Wisconsin Central Ltd.*, 585 U.S. at 278–79.

The Legislature recently made clear the Agency's interpretation of "promotional items" is not entitled to deference by codifying the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). "[T]he interpretation of constitutional or statutory provisions" should be made by courts, "without giving deference to any legal determination by a state agency." Tex. Gov't Code § 2001.1721(a).

In construing Texas agency powers, the Texas Supreme Court has been clear that "courts should not give an undefined statutory term a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such a construction if standing alone." *See, e.g.*, *Tex. Dept. of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *cf.* Tex. Gov't Code § 311.011. And in no instance where the term has been used has the Legislature indicated it could ever expand an agency's authority to engage in the very commerce it was regulating, or otherwise engage in a new line of business.

Defendants' own evidence confirms this point, as Deputy Administrator Cruz explains that the Agency markets its products as "coins" to qualify them "as a **permissible investment** in an individual retirement account under 28 USC §408(m)(3)(A)(4)." Dkt. 23-2 ¶ 12 (emphasis added).

---

grown, processed, or produced in this state." Tex. Agric. Code § 46.0095(a) (emphasis added). Under the heading Sale of Promotional Items and Media and Training Materials, the Texas Education Code authorizes the Texas Higher Education Coordinating Board to sell "promotional items, including clothing, posters, and banners, designed to promote the public awareness campaign." Tex. Educ. Code § 61.9705(a) (emphasis added). Under the heading *Packaging of Certain Promotional Items Authorized*, the Texas Alcoholic Beverage Code authorizes brewers to package promotional items with alcoholic beverages only if those promotional items are "other items" and not the regulated product itself. Tex. Alco. Bev. Code § 108.035.

These products are designed and marketed by Defendants as "investment" vehicles—not incidental promotional merchandise aimed at promoting the Agency. *See id.*

Defendants' program goes beyond the Agency's custodial mission by commissioning, minting, and commercializing state-branded gold and silver "coins" and "notes," while promoting them with sovereign cues (including "official" offerings and statements that the products are "struck by the State of Texas"). Any attempt by a state to mint currency is unconstitutional. U.S. Const. Art. I, § 10. Under the Constitution's original public meaning, "to coin money" was understood as a power to "strike coin," and precious metals "when stamped with a designated value" were understood as money. *Legal Tender Cases*, 79 U.S. 457, 464–66 (1870).

In the precious metals market, "coins" are commonly understood as government-issued legal tender coinage, distinct from privately minted "rounds." Ex. A, Saab Decl. at ¶ 15; s*ee also, e.g.*, U.S. Mint, Coin Term Glossary (defining "Coin" as a "flat piece of metal issued by the government as money"); U.S. Mint, Bullion Coin Programs (stating that American Eagle Bullion Coins are "legal tender coins"). Market participants use the term "coin" to denote official coinage, and "coin" conveys sovereign issuance and authenticity in a way "round" does not. Ex. A, Saab Decl. at ¶ 15. That is exactly how Defendants unlawfully structured and deceptively marketed this program. By Defendants' own terms, these products stop being "promotional" because they are marketed and sold as investment pieces and collectible goods, not incidental promotional merchandise.

Here, Defendants' products are marketed for investment and appreciation, emphasizing scarcity as a value driver and creating resale expectations—hallmarks of a commercial investment product rather than an incidental promotional item. And the program is plainly structured to generate profits, not merely defray costs. Ex. A, Saab Decl. at ¶¶ 45–46.

9

Because Chapter 2116 does not expressly authorize Defendants to mint, market, and sell the Agency Products—and because the U.S. Constitution prohibits states from minting coined currency—TPM is likely to prevail on its *ultra vires* claim.

### c.   *Defendants Failed to Adopt Rules to Carry Out Chapter 2116*

Even if Defendants thought they had discretion to mint, market, and sell commemorative coins, they did not properly employ it and instead failed to follow the statutory command "[t]he comptroller shall adopt rules necessary to carry out this chapter." Tex. Tex. Gov't Code § 2116.002(c). Without proper rulemaking, including the opportunity for notice and comment, any engagement in new business activities like the State of Texas Coin and Redback program is *ultra vires* and thus should be declared "invalid and of no effect." *See, e.g.*, *Nat'l Ass'n Chain Drug Stores, Inc. v. Young*, 2024 WL 2971681, at \*10 (Tex. App.—Amarillo Jun. 12, 2024, pet. denied).

### B.  TPM Will Prevail On Its False Advertising and False Designation of Origin Claims

A plaintiff makes a prima facie case for false advertising under the Lanham Act by establishing: (1) A false or misleading statement of fact about a product, (2) the statement deceived or had the capacity to deceive a substantial segment of potential consumers, (3) the deception was material, (4) the product was in interstate commerce,[12] (5) actual or likely injury as a result of the defendant's false or misleading statement. *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000). The same elements apply to a claim for false designation of origin under the Lanham Act. *Nestle USA, Inc. v. Ultra Distribuciones Mundiales S.A. de C.V.*, 516 F. Supp. 3d

---

[12] The record shows that Defendants sell and market the Agency Products online in interstate commerce. Ex. A, Saab Decl. at ¶¶ 30, 34; *see also* Exs. A-14, A-15 (Agency Products available for sale online); Ex. B, Declaration of Ryan Sullivan ("Sullivan Decl.") at B-2, 54–55 (Trans. 19:12–20:3) (counsel for Defendants admitting Agency Products are available for purchase online); *see also United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) ("[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce."); *Greater Houston Transportation Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 702–03 (S.D. Tex. 2015). Defendants admitted partnering with an out-of-state entity, Scottsdale Mint, LLLP, to mint the State of Texas Coins. Exs. A-8, A-10 (correspondence between the parties).

633, 650–51 (W.D. Tex. 2021). TPM meets these criteria. Therefore, injunctive and other appropriate relief is warranted under 15 U.S.C. §§ 1116 and 1117.

### a. Defendants Falsely and Misleadingly Describe the Products as "Official" and "Coins" When They Are Neither

On its website, the Agency markets the Agency Products as part of an "official" program authorized by the State of Texas. But, as discussed above, the Agency has no statutory authority to mint, market, or sell precious metals. Defendants further promote the State of Texas Coins as "coins." But that description is false. The "coins" are "rounds" because they are not minted by a sovereign entity and have no face value or legal tender status.[13] Defendants cannot mint "coins" without violating the U.S. Constitution. U.S. Const. Art. I, § 10. ("No State shall . . . coin Money.").

A disclaimer does not cure otherwise false or misleading statements. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F. 3d 526, 553 (5th Cir. 1998) ("the use of disclaimers alone by Tour 18 has been found to be ineffective in preventing a likelihood of confusion"). Even when a defendant's advertising includes a disclaimer, injunctive relief is appropriate if the disclaimer does not "effectively remedy the false or misleading statements." *Eastman Chem. Co. v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 770 (W.D. Tex. 2013), *aff'd*, 775 F.3d 230 (5th Cir. 2014). As the evidence of actual consumer confusion shows, Defendants' disclaimers do nothing to remedy their false and misleading statements.

---

[13] Defendants rely on a dictionary definition that reduces "coin" to anything resembling a coin in shape. Dkt. 23 at 10. But even the source they cite defines "coin" first as "a usually flat piece of metal **issued by governmental authority as money**." *See* https://www.merriam-webster.com/dictionary/coin (emphasis added). And the second definition is "metal money." *Id*. In the precious metals market, the term means "official coinage by sovereign-governments with face value and legal tender status." Ex. A, Saab Decl. at ¶ 15. Defendants' own marketing agent, United States Gold Bureau, states as much on its website. *See* https://www.usgoldbureau.com/news/post/bullion-bars-bullion-coins-difference?srsltid=AfmBOopkS2VFMWrhQZsgrm4WYiqfdrlQdUlLh2QjW3lTc_MROxC33wLS, last accessed March 27, 2026 ("Rounds will have some similarities to coins in shape, weight, and appearance, but also some important distinctions. Coins issued by a government have a date and a monetary denomination.").

### b. *Defendants' False and Misleading Statements Materially Deceive Consumers*

Where a defendant makes literally false statements, "the court will assume that the statements actually misled consumers." *Pizza Hut*, 227 F.3d at 497. When a defendant's statements are misleading but not literally false, a plaintiff seeking a preliminary injunction need show only that "at least some consumers were confused by the advertisements." *Id*. at 497–98  (citing *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc*., 185 F.3d 606, 618 (6th Cir. 1999) ("Although plaintiff need not present consumer surveys or testimony demonstrating actual deception, it must present evidence of some sort demonstrating that consumers were misled.")). A defendant's deception is material when its statements "have a tendency to influence the purchasing decisions of the consumers to which they were directed." *Id*. at 502.

Here, Defendants' statements that their products are "official" and "coins" are literally false as they admit they are not "legal tender." Because the Agency's literally false statements alone are actionable, any "argument that it did not mislead its customers and that the advertising did not affect their purchasing decision is inconsequential." *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (citing *Pizza Hut*, 227 F.3d at 497). But even literally true, but misleading statements are actionable when material, and the uncontested record shows real-world consumers are confused by the Agency's marketing of its "official" "coins." In the precious metals market, indicators of authenticity and source directly influence purchasing decisions. *See* Ex. A, Saab Decl. at ¶¶ 70–72. A mint mark signals the origin and credibility of a bullion product. *Id*. at ¶ 12. By promoting the Agency Products as part of an "official" State program and State-minted "coins," Defendants convey assurances of authenticity and legitimacy that consumers reasonably rely on when deciding whether to purchase precious metals.

12

The record shows that Defendants' representations influence purchasing decisions. Ex. A-20. For example, a customer contacted TPM intending to purchase "30 of the Texas silver coins," but declined to buy after learning that TPM's products were not "the official stuff." *Id*. As another example, a consumer said on YouTube:

> . . . the coins that are coming out of the Texas Comptroller's Office very well could be coins because they're **recognized directly by the government**. . . . It's pretty wild. And so, y'know, it's pretty amazing. There's no denomination on these. But **they're backed by the government of Texas**. And they're sold by the government of Texas. And they **could be used essentially, if they recognize gold and silver as money, they could be used in transactions**. So if the government backs it up, the government of Texas, it's not a dollar, **but it is a coi**n. There's just no denomination on it."[14]

Relying on the Agency's products are "official" and "coins," the same consumer later purchased the Agency Products and said, "I bought these for **historic reasons**."[15]

Thus, Defendants' misrepresentations confused at least some real-world consumers and influenced their decisions to purchase Defendants' products over TPM's products.

### c. *Defendants' Violations Injure TPM*

TPM need only prove a "likelihood of injury" meaning that it is or will be "in some way injured" for injunctive relief. *See Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Dist. Co.*, 520 F.3d 393, 401 (5th Cir. 2008) (quoting *Logan*, 263 F.3d at 463). Such proof may be "inferred" from its business interest in the market and does not require proof of "actual losses because of the false advertising." *Logan*, 263 F.3d at 462–63. Nevertheless, the record includes substantial evidence of both. Ex. C, Expert Report of Donald House ("House Report"). The Agency's unauthorized entry into the precious metals market places it in direct competition with TPM for

---

[14] *See* https://www.youtube.com/watch?v=bsivT_En4ms, at 4:50, last accessed Mar. 27, 2026; *see also* Ex. B-5 (printout of same).

[15] *See* https://www.youtube.com/watch?v=A1aqwEsCwUA, at 0:55, last accessed Mar. 27, 2026; *see also* Ex. B-6 (printout of same).

the same customers seeking to purchase gold and silver rounds and gold notes. *Id*. Each misleading promotion and sale diverts customers, weakens the distinctiveness of TPM's mark, and damages the goodwill the company has built in the marketplace. Ex. A, Saab Decl. at ¶¶ 63–65. Moreover, TPM is forced to compete with an unauthorized market entrant that is able to charge artificially high premiums as a result of Defendants' false advertising. Ex. C, House Report. That harms TPM by unfairly putting it at a competitive disadvantage. *Id*.

### C.  TPM Will Prevail On Its Trademark Infringement and Counterfeiting Claims

A plaintiff establishes a trademark infringement under the Lanham Act when it meets two criteria: (1) possession of a legally protectable trademark, and (2) the defendant's use of the trademark "creates a likelihood of confusion as to source, affiliation, or sponsorship." *Wilson v. Tessmer L. Firm, PLLC*, 483 F. Supp. 3d 416, 424 (W.D. Tex. 2020) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). A trademark infringement claim supports a claim for trademark counterfeiting when the defendant intentionally uses the trademark knowing the infringing mark is "spurious [and] . . . identical with, or substantially indistinguishable from, a registered mark." *See Springboards to Educ., Inc. v. Kipp Found.*, 325 F. Supp. 3d 704, 713 (N.D. Tex. 2018); 15 U.S.C. § 1116(d)(1)(B). A "certificate of registration for its federal trademark is prima facie evidence of a trademark's validity and of the register's exclusive right to use it in connection with the designated commercial services." *Wilson*, 483 F. Supp. 3d at 424 (citing 15 U.S.C. §§ 1057(b), 1115(a)). Likelihood of confusion is generally a question of fact and may be shown by multiple "digits of confusion," including "similarity of design between the marks," "similarity of the products," and "actual confusion," among other factors. *Id.* at 425.

TPM meets these standards. First, TPM owns an incontestable federal trademark registration for the Mint Mark and additional federal trademark registrations relevant to this action. Ex. A, Saab Decl. at ¶¶ 21–24; Exs. A-3 through A-7. Second, as discussed above, there is ample

14

evidence of actual confusion. As by a side-by-side comparison shows, the design of Defendants' State of Texas Coins is highly similar to TPM's Texas Rounds. The record shows that the products at issue—gold and silver rounds and gold notes—are similar. Nor is there any dispute that both sets of products feature a silhouette of the State of Texas on precious metals rounds or "coins," *i.e.*, the subject of TPM's incontestable trademark registrations. Ex. A, Saab Decl. at ¶ 21. Defendants knew of TPM's incontestable trademark registrations but proceeded to mint, market, and sell the State of Texas Coins anyway. *Id*. at ¶¶ 37–51. Thus, Defendants infringed on TPM's marks and did so knowing the State of Texas Coins were identical with, or substantially indistinguishable from TPM's rounds.

## II.    Irreparable Harm Will Result If the Injunction Is Not Granted

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "Money damages are not available in an ultra vires action," meaning any demonstrated harm is irreparable. *See State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020). Loss of goodwill generally is an irreparable injury that money damages cannot fully repair. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989). Since the Lanham Act was amended in 2020, a "plaintiff seeking such an injunction 'shall be entitled to a rebuttable presumption of irreparable harm.'" *Yeti Coolers, LLC v. Mercatalyst, Inc.*, No. 1:22-CV-01337-DAE, 2024 WL 1216726, at *5 (W.D. Tex. Mar. 21, 2024) (quoting 15 U.S.C. § 1116(a)). TPM is suffering—and will continue to suffer—irreparable harm in the form of lost goodwill, reputational injury, lost sales, and unfair competitive disadvantage. The records show that these injuries are escalating and cannot be undone with money damages.

15

### A.  The Ongoing Harm Caused By Defendants Is Escalating

The current record shows escalating, irreparable harm. TPM submitted concrete, real-world evidence of confusion and competitive injury, including customer calls, online posts, and instances of consumers mistaking Defendants' products for TPM's goods or for official legal tender. Ex. A, Saab Decl. at ¶¶ 64, 73; Ex. A-21; Ex. A-20. That harm is occurring now, and increasing.

At the February TRO hearing in state court, the court questioned whether the initial record established sufficient urgency for a duty judge but set the matter for a March 5 hearing to consider such evidence. Ex. B-2 at 31:25–32:13; Dkt. 1-5 at 150. Since then, the record demonstrating consumer confusion and irreparable harm has only grown. *See* Ex. A-20. TPM submitted additional call transcripts and online posts showing continued and intensified confusion in the weeks following the program's launch. *Id*. Consumers continue to mistake Defendants' products for TPM's products, believe TPM is affiliated with Defendants' program, and assume the products are official or legal tender. *See, e.g.*, Ex. A-21 (In reference to Defendants' announcement of the State of Texas Coins, an X user erroneously posted online that the State of Texas has been selling the State of Texas Coins since 2017 and included a link to TPM's website.); *id*. ("Texas just announced they will be producing their own money in gold and silver coins."); Ex. A, Saab Decl. at ¶ 59.

Each sale of Defendants' products reinforces the same mistaken associations. *See id*. at ¶¶ 64–69; Ex. C, House Report. Each new customer encounter spreads the confusion further. *See id*. Each sale also compounds the harm to TPM by further reinforcing Defendants' premiums that exceed those charged by established market participant. *See* Ex. C, House Report. Defendants' *ultra vires* acts, false and misleading statements, and infringing use of TPM's marks enable Defendants to charge premiums that no new market entrant should be able to charge. *Id*. Those premiums exceed even those of an established, reputable seller that has been in the market for

16

precious metals sales for more than 15 years. *Id*. That competitive advantage is unfair and causes ongoing, irreparable harm. *Id*.

### B. Defendants' Conduct Is Causing Loss of Goodwill and Customer Confusion

Defendants' conduct is causing actual customer confusion and eroding TPM's goodwill. The record already includes multiple transcripts of calls and dozens of internet posts showing that consumers mistakenly believe Defendants' products are affiliated with, sponsored by, or approved by TPM. Exs. A-16 through A-22. Public commentary reflects the same confusion. *See, e.g.*, https://www.youtube.com/watch?v=o1-nHgeBUgY, last accessed Mar. 27, 2026 ("With gold and silver now legal tender, state-branded coins and gold-backed 'Redback' notes sold through a .gov site, and a gold-backed debit card system launching in 2027, Texas is quietly building a parallel monetary system."); Ex. B-7.

This confusion is ongoing and expanding. Consumers encountering Defendants' products today are forming mistaken impressions that will shape future purchasing decisions in ways TPM cannot track or correct. *See* Ex. C, House Report. That harm is real even when it cannot be traced to a specific lost sale. *Id*.

Defendants' use of TPM's Mint Mark drives that confusion and strips TPM of control over its own reputation. Defendants prominently display the mark and market their products as part of an official state initiative. *See* Ex. A, Saab Decl. at ¶¶ 14, 29, 32, 60. As a result, consumers attribute the Agency Products—and any perceived shortcomings—to TPM. TPM cannot control those products, their pricing, or the messages used to sell them. But it bears the reputational consequences.

The harm is both immediate and continuing. *Id*. Each sale, advertisement, and customer interaction reinforces the false association and further erodes TPM's goodwill. Left unchecked, that erosion will accelerate as Defendants expand their presence in the market. *Id*.; Ex. C, House

17

Report. This injury cannot be fully remedied through damages awarded after trial. Ex. C, House Report. The loss of control over reputation, the spread of confusion, and the resulting damage to goodwill are not readily quantifiable. Ex. A, Saab Decl. at ¶¶ 14, 29, 32, 60; Ex. C, House Report.

Defendants' conduct also distorts the market. By presenting their products as "official," Defendants secure an undeserved foothold in the emerging market for gold-backed notes and sell coins at inflated premiums beyond what established precious metals sellers can charge. *See* Ex. C, House Report. This unfair advantage diverts customers and market share away from TPM.

These harms reinforce one another. Confusion diverts customers. At the same time, it weakens TPM's brand by associating it with products and practices outside its control. The result is a continuing, unquantifiable loss of goodwill that warrants immediate relief.

**C.  TPM's Injuries Cannot Be Adequately Remedied by Money Damages**

Money damages cannot adequately remedy the injuries caused by Defendants' conduct. *See Allied Mktg. Grp., Inc.*, 878 F.2d at 810 n.1. Defendants continue producing and selling coins bearing TPM's Mint Mark despite lacking authority to do so. Each sale diverts a customer and further entrenches confusion in the marketplace.

These losses are also difficult to quantify. *See* Ex. C, House Report. Precious metals markets are volatile and price-driven. Each diverted transaction occurs at a specific moment in a fluctuating commodities market and cannot later be recreated with precision. As the program expands, the lost sales, lost customers, and diminished brand value compound.

Nor can damages restore TPM's goodwill or eliminate consumer confusion once it spreads through the market. Because these harms are ongoing and difficult to quantify, injunctive relief is necessary to prevent further injury. An injunction will preserve the status quo by preventing further diversion of customers, continued erosion of TPM's goodwill, and ongoing marketplace confusion caused by the State's unauthorized entry into the precious metals retail market.

**III.    The Balance of Harms and the Public Interest Favor Preliminary Injunctive Relief**

A preliminary injunction is proper where denying the injunction would harm the plaintiff more than granting the injunction would harm the defendant. *Interactive Life Forms, LLC v. Weng*, No. A-12-CA-1182-SS, 2013 WL 12116329, at *1 (W.D. Tex. Jan. 15, 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). Harm to a defendant does not tip the "balance of harms" in favor of denying the injunction. *Id*. at *3. And the public interest favors removing unauthorized products from the marketplace. *See id*. ("[W]hile the public has an interest in market competition, such competition must be lawful.").

Both the balance of harms and the public interest favor preliminary injunctive relief. First, the threatened injury to TPM is immediate and irreparable. *See* Ex. A, Saab Decl. at ¶¶ 14, 29, 32, 60; Ex. C, House Report. By contrast, any harm to Defendants from an injunction results from their own conduct. The requested relief would prevent Defendants from continuing an unlawful commercialization program and from using TPM's Mint Mark and confusing sovereign-style messaging in connection with retail sales. *Cf. ConcernedApe LLC v. Partnerships & Unincorporated Associations Identified on Schedule A*, No. 1:25-CV-1537-RP, 2025 WL 3290428, at *2 (W.D. Tex. Nov. 26, 2025) (harm to defendants from being restrained from unlawful sales is outweighed by harm to plaintiff's reputation and goodwill).

Second, the public interest independently favors an injunction. Enjoining Defendants' conduct would preserve the separation of powers by ensuring that state officials operate within the limits of their statutory authority. *See State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020). It would also protect consumers from being misled about the source, sponsorship, or affiliation of precious metals products marketed under the State's imprimatur and bearing TPM's Mint Mark. *See ConcernedApe*, 2025 WL 3290428, at *2 (public interest favors protecting trademark interests and protecting the public from being defrauded by the palming off of counterfeit goods).

Finally, the injunction would maintain the lawful status quo pending trial—*i.e.*, "the last, actual, peaceable, noncontested status which preceded the pending controversy." *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 553–54 (1953). Before Defendants launched the Agency Products, the Agency functioned as the Legislature intended: a custodian of precious metals, not a state-backed competitor in the retail precious metals market. Because the threatened injury to TPM substantially outweighs any harm to Defendants, and because the requested relief advances the public interest, the Court should grant the preliminary injunction.

## IV.     Defendants' Second-Filed Case Should Not Derail This Case

Courts in the "Fifth Circuit adheres to the 'first-to-file rule,' which states that . . . the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Needbasedapps, LLC v. Robbins Rsch. Int'l, Inc.*, 926 F. Supp. 2d 907, 913 (W.D. Tex. 2013) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir.1999)). Thus, "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 976 (5th Cir. 2015), *as revised* (May 15, 2015). Where the first case is filed in state court, the first-to-file rule runs from the date of the state court petition. *Id.*

TPM originally filed this case in Texas state court on February 4, 2026. Dkt. No. 1-5. Nearly one month later, on March 2, 2026, Defendants removed to this Court, then filed the related pending litigation in the Northern District of Texas. *See State of Texas, et al. v. Texas Precious Metals, LLC*, 7:26-cv-00021 (N.D. Tex.). The case before this Court is first-filed and involves the same parties and set of operative facts, and this Court is the appropriate court to determine whether the related pending litigation should proceed. TPM already moved to dismiss the related pending litigation and transfer to this Court under the first-filed rule, among other reasons. *See id.* at Dkt. Nos. 14–16.

20

## CONCLUSION AND PRAYER

Based on the foregoing, TPM respectfully requests that the Court enter a preliminary injunction order under Federal Rule of Civil Procedure 65 and enjoin Defendants from: (1) using TPM's Mint Mark or any confusingly similar designation in connection with any precious metals products; and (2) minting, marketing, offering for sale, selling, or otherwise facilitating the sale of the state-branded precious metals products at issue in this case in a manner that creates a false impression of affiliation, sponsorship, approval, or "official" "coin" status.

Date: March 27, 2026

Respectfully submitted,

*/s/ Ryan Sullivan*

Casey Low
Texas Bar No. 24041363
casey.low@pillsburylaw.com

Ryan J. Sullivan
Texas Bar No. 24102548
ryan.sullivan@pillsburylaw.com

Elizabeth Blackford (*Pro Hac Vice*)
Texas Bar No. 24150283
elizabeth.blackford@pillsburylaw.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
401 W. 4th Street
Suite 3200
Austin, TX 78701
(512) 580-9600

*Attorneys for Texas Precious Metals, LLC*

21

## CERTIFICATE OF SERVICE

The undersigned certifies that, on March 27, 2026, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/   *Ryan Sullivan*
Ryan Sullivan

## CERTIFICATE OF CONFERENCE

This is to certify that counsel for the parties conferred regarding the relief requested herein. Counsel for Defendants stated that they are opposed.

/s/   *Ryan Sullivan*
Ryan Sullivan

22